UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MATTHEW BURGOYNE,<br><br>                    Plaintiff,<br><br>v.<br><br>ROCK CREEK FIREFIGHTERS ASSOCIATION, INC. and ROCK CREEK RURAL FIRE PROTECTION DISTRICT,<br><br>                    Defendants. | Case No. 1:20-cv-00511-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Pending before the Court is Plaintiff Matthew Burgoyne's motion for partial summary judgment. Plaintiff requests that the court find, as a matter of law, that Defendants Rock Creek Firefighters Association, Inc. ("the Association") and Rock Creek Rural Fire Protection District ("the District") are liable for discrimination under Title I of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et. seq*.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Idaho Human Rights Act, Idaho Code § 67-5901 *et. seq*., and that the Court award nominal damages.

Burgoyne's motion is limited, however, to his claim of liability, reserving the issue of damages for trial.

Burgoyne served as a volunteer firefighter for the Rock Creek Rural Fire Protection District for nearly two years. He is deaf, and communicates using American Sign Language. Neither party disputes Burgoyne is disabled within the meaning of the ADA. Burgoyne contends that, despite his hearing impairment, he is a qualified individual. He asserts that he was subjected to unlawful discrimination throughout his employment in the areas of advancement, discipline, job training, work environment, and termination.

The Court held a hearing on the motion on August 31, 2022. After carefully considering the parties' arguments, written memoranda, and relevant legal authorities, and consistent with the Court's comments on the record during the hearing, the Court will deny Plaintiff's motion for partial summary judgment.

///

# FACTS[1]

Except where noted, the following facts appear undisputed from the parties' briefs

and exhibits, and are set forth concisely in their respective statements of fact.[2]

Burgoyne has had hearing loss since birth, and is "profoundly deaf." Burgoyne

Dep. 31:13-31:18, Rozynski Decl. Ex. 1. (Dkt. 29-2.) PSOF ¶ 1. Neither cochlear

implants nor hearing aids allowed him to successfully hear. *Id.* at 31:13 – 33:10. While

wearing cochlear implants, Burgoyne can hear "environmental sounds," but no spoken

words or language. *Id.* However, he cannot tolerate using the cochlear implants for more

than fifteen minutes at a time. *Id.* He can understand someone's spoken words by reading

lips. *Id.* at 34:1-34:10. He communicates using American Sign Language (ASL), or

writing. PSOF ¶ 2; DSOF ¶ 2.

The Rock Creek Rural Fire Protection District ("the District") has a Career Chief,

seven full-time paid firefighters, three part-time paid firefighters, one part time clerk, and

---

[1] In the reply brief, Plaintiff objected to Defendants' submission of "sham affidavits of its own employees," contending that, collectively, they are inconsistent with prior testimony and established facts. "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). But, not every inconsistency affords a basis for excluding an affidavit or declaration. *See Messick v. Horizon Indus.*, 62 F.3d 1227, 1231 (9th Cir. 1995). Plaintiff did not object to specific statements, or otherwise explain why the declarations submitted by Defendants constitute sham affidavits in their entirety. For the reasons stated on the record, the Court overrules Plaintiff's objections. The affidavits are not directly contradictory and instead attempt to explain prior testimony provided by witnesses during their depositions. Plaintiff also objected to the Court's consideration of Gary Sabin's declaration, because it did not contain a signature, only a "/s/". (Dkt. 34-5 at 5.) However, pursuant to the Court's electronic case filing procedures, the signature line on Sabin's declaration is sufficient to satisfy the Court's electronic signature requirement. Electronic Case Filing Procedures ¶ 13.

[2] Plaintiff's Statement of Material Facts is at Docket 32-1, while Defendants' Statement of Disputed Facts is at Docket 33-1. The respective statements will be cited as follows: Plaintiff: PSOF; Defendants: DSOF.

between 25 and 30 volunteer firefighters. (Dkt. 36-2.) Volunteer firefighters are paid solely on a per call basis, and may respond if available. *Id.* There is no set schedule or minimum time commitment required for volunteer firefighters. *Id.*

The Rock Creek Firefighters Association, Inc., is a non-profit corporation organized under the laws of the State of Idaho. Between 2017 and 2019, the Association did not have any employees. Vawser Decl. ¶¶ 2 – 5. (Dkt. 34-7.)

Burgoyne was hired by the District on November 29, 2017, as a volunteer firefighter. (Dkt. 36-2 at 2.) His employment was terminated on July 3, 2019. PSOF ¶ 22; DSOF ¶ 22. The Association did not have any involvement with Burgoyne's employment conditions or the termination of his employment by the District. Vawser Decl. ¶ 5. (Dkt. 34-7.)

The District does not dispute that Burgoyne was a competent firefighter with a limited role. DSOF ¶ 33. Captain Jason Freeman testified during his deposition that Burgoyne competently assisted on the handline for wildland fires. Freeman Dep. 41:1-17, Rozynski Decl. Ex. 8. (Dkt. 29-10.) From June of 2018 to July of 2019, Burgoyne responded to approximately 50 calls, and participated in numerous training exercises. (Dkt. 36-2 at 2.)

After Burgoyne joined the fire department, the District adopted a Standard Operating Procedure which applied only to "hearing impaired firefighters." DSOF ¶ 3. (Dkt. 29-8.) Among its other provisions, the SOP prohibited hearing impaired firefighters from participating in interior fire attacks at structure fires; entering structures for the purposes of determining the existence and/or location of a fire; operating in any

**MEMORANDUM DECISION AND ORDER - 4**

atmosphere requiring SCBA;[3] or operating in any area where immediate communication is critical to personnel safety.

Burgoyne completed numerous training courses applicable to firefighting,[4] such as wildland firefighting FFT1 and FFT2, wildland firefighting S-230 Crew Boss, Wildland Firefighting S-125 Urban Interface. (Dkt. 29-9.) He also has taken and passed the Idaho FST Firefighter I written and skill exam. *Id.*

The District did not provide an ASL interpreter for Burgoyne, other than during the National Registry EMT skills test and the appeal hearing for his termination. PSOF ¶ 4; DSOF ¶ 4. The District contends the costs of hiring an ASL interpreter for other meetings or purposes was not reasonable. DSOF ¶ 4.

It was important for firefighters to be able to receive information or communicate information to the Southern Idaho Regional Communications Center ("SIRCOMM"), a regional dispatch center. PSOF ¶ 5; DSOF ¶ 5. *See also* Freeman Dep. 48:22-25. (Dkt. 29-10.) Captain Freeman gave Burgoyne permission to reach out to SIRCOMM to discuss a way to communicate. *Id.* Burgoyne and SIRCOMM established a means of communicating via cell phone text messages, where Burgoyne could inform SIRCOMM

---

[3] A self-contained breathing apparatus (SCBA) is a device worn to provide breathable air in an atmosphere that is immediately dangerous to life or health. http://futurefirefighters.org/firefighters-self-contained-breathing-apparatus-scba/

[4] Burgoyne refers to the courses as "certifications." PSOF ¶ 3. The District disputes that the coursework can accurately be described as a certification. DSOF ¶ 3. Burgoyne did not present evidence of any formal certification or official document associated with having completed the courses he listed.

**MEMORANDUM DECISION AND ORDER - 5**

that he was on his way and SIRCOMM could relay information to him. *Id.* Chief Aaron

Zent was aware of this accommodation. Zent Decl. ¶ 27. (Dkt. 34-6.)

The District conducted weekly training sessions that volunteer firefighters were

invited to, but not required to, attend. PSOF ¶ 6; DSOF ¶ 6. Bagley Dep. 18:13-16. (Dkt.

29-14.) Burgoyne testified during his deposition that he tried to get involved in these

training sessions, but was ignored or laughed at. PSOF ¶ 6. The District, however, denies

that Burgoyne was ostracized, ignored, or laughed at during training sessions. DSOF ¶ 6.

Burgoyne asserts he was treated differently than other firefighters. For instance,

Burgoyne contends he was placed on standby for most calls; he was yelled at by another

firefighter, Gary Sabin; he was not allowed to drive big trucks, although others without

certifications to do so were allowed to drive them; Captain Freeman ignored his requests

to work in wildland firefighting but assisted others to do so; he was not allowed to do

station shift coverage; he was not given new turnout gear or a new flashlight; and, on one

mutual aid call, he was ordered to wait in the truck without explanation. When Burgoyne

questioned why he was ordered to stay in the truck on one particular aid call, Chief

Vawser counseled him for questioning a command decision. PSOF ¶¶ 7 – 13.

The District disputes Burgoyne's characterization of the above situations. DSOF

¶¶ 7-13. The District explains that volunteer firefighters were frequently placed on

standby; Gary Sabin often raised his voice to others; Burgoyne was not trained on

operating the pump on the trucks; Captain Freeman assisted Burgoyne to train on

wildland fires, but had no hiring authority; Burgoyne did not have EMT or driver

certification, which was required for station shift coverage; volunteer firefighters were

often given expired turnout gear due to budget constraints; and flashlights were for those able to perform interior structure firefighting. *Id.* The District contends Burgoyne mischaracterizes Chief Vawser's response to Burgoyne's question about the order to remain in the truck on the mutual aid call, contending that Vawser objected only to discussing "command decisions by text." DSOF ¶ 13. Vawser Decl. ¶ 13. (Dkt. 34-7.)

Burgoyne asserts also that other colleagues made derogatory remarks to him. PSOF ¶ 14. The District disputes such instances occurred or were reported to Captain Thomas, Interim Chief Vawser, or Chief Zent. DSOF ¶ 14. Zent Dep. 106:21-25. (Dkt. 29-4.) Burgoyne also recounts that, during SCBA training, Captain Freeman and others at the training laughed at him. PSOF 15. The District denies this incident occurred or was reported. DSOF 15. Freeman Decl. ¶ 11. (Dkt. 34-8.) Last, Burgoyne describes an incident where Captain Thomas removed a nameplate Burgoyne had placed on his locker that read, "Deaf Firefighter." PSOF ¶ 16. Burgoyne contends he never received an explanation for its removal, and that another firefighter replaced the nameplate with a food paper plate with Burgoyne's name. *Id.* The District admits Captain Thomas removed the nameplate Burgoyne had placed, and that Thomas explained his reasons for doing so to Burgoyne. DSOF ¶ 16. The District denies Burgoyne ever reported the later incident with the paper plate. DSOF ¶ 16.

Burgoyne claims he filed an internal complaint documenting discriminatory conduct on February 20, 2019. PSOF ¶ 17. The District disputes Burgoyne's characterization of the document, asserting that the document makes no mention that Burgoyne believed the described conduct of Captain Thomas or firefighter Dirks

constituted discrimination based upon his disability. DSOF ¶ 17. Burgoyne contends that Chief Zent failed to investigate the incident described in the document, but the District counters that Chief Zent was not employed by the District until three months after the purported complaint was made. PSOF ¶ 17; DSOF ¶ 17.

Burgoyne claims he sought mental health counseling because of the discrimination he experienced while working as a volunteer firefighter. PSOF ¶ 18. The District disputes this was the reason Burgoyne sought counseling, referencing a text exchange Burgoyne had with Captain Freeman on April 1, 2019, wherein Burgoyne indicated he was "having a melt down" because he got "Greg in trouble" and "Gary chewed at me." DSOF ¶ 18. (*see also* Dkt. 29-28.)[5]

On or about April 11, 2019, then interim Chief Greg Vawser drafted a letter of termination addressed to Burgoyne. (Dkt. 29-24.) The letter stated that, "[a]fter consulting with the commissioners of the Rock Creek Rural Fire Protection District concerning the events of April 1, 2019, it is the consensus of the commissioners, the shift captains, the EMT department heads and myself that your position as a paid-on-call firefighter be terminated." (Dkt. 29-24.) The letter cites the following reasons for the termination decision: (1) "disregard" for Gary Sabin and the command structure of the district; (2) a previous verbal reprimand for questioning the decision of a officer; (3) Burgoyne's threat that he would file a discrimination claim against the district if

---

[5] The report documenting Burgoyne's diagnostic assessment is dated July 10, 2019. (Dkt. 29-23.) It appears Burgoyne was referred to counseling by the District to "be reevaluated to be clear and mentally healthy." (Dkt. 29-23.)

dismissed; and (4) Burgoyne's comments that he was thinking of self-harm. (Dkt. 29-24.) The District does not deny the letter was drafted, but notes it was never sent nor was it made effective. DSOF ¶ 19. Burgoyne, however, saw the letter on April 2, 2019. (Dkt. 29-28 "They are firing me. I saw a letter.").

On June 12, 2019, Chief Zent[6] had what he characterized as an informal meeting, without an interpreter present, where he instructed Burgoyne to bring all of his "concerns and questions to [him] for all department issues." Zent Dep. 79:1-25. (Dkt. 29-4.) "It was just a plan going forward for bringing those issues to me." Zent Dep. 80:15-17. Zent does not recall giving Burgoyne an order not to contact SIRCOMM under any circumstances during this meeting – only to "go through me and I would be with them on any problems in the future." Zent Dep. 83:3-17.

Burgoyne recalls this meeting differently, indicating an interpreter was present. Burgoyne Dep. 106:3-23. (Dkt. 29-2.) He acknowledges that Zent directed him to bring all issues directly to Zent, but Burgoyne did not think that meant he had to "stop continuing communications with what was going on currently." Burgoyne Dep. 107:4-8. Burgoyne also does not recall that Zent told him he could not contact outside fire or EMS organizations. Burgoyne Dep. 106:20 – 107:3.

Prior to the June 12, 2019 meeting, Zent had learned from SIRCOMM that the "extensive text messages, is becoming disruptive and with their limited staff and high stress situation, that it's starting to disrupt their job as dispatchers." Zent Dep. 83:3 –

---

[6] Aaron Zent became Chief in mid-May of 2019. Zent Dep. 99:3-6.

84:18.[7]   Zent told Burgoyne not to communicate with SIRCOMM via text unless it was

an emergency, and instead to contact Zent with any issues or questions. Zent Dep. 89:15-

21. Zent Decl. ¶ 27. PSOF ¶ 21. On June 13, 17, and 22, 2019, Burgoyne texted

SIRCOMM that he was "enroute to station 1;" and "thank you for the page." (Dkt. 29-

27.)[8] The District asserts these communications were not "emergencies." DSOF ¶ 21.

Burgoyne, however, points out that no one from SIRCOMM during this time period

asked him to stop texting, and that these communications concerned emergency incidents

when he had been paged. DSOF ¶ 24. Burgoyne Dep. 108:20-25. (Dkt. 29-2.)

On July 1, 2019, the District held a meeting which Burgoyne attended. Burgoyne

Dep. 110:14 – 112:21. (Dkt. 29-2.) Firefighter Chris Nelson presented information during

the meeting about the requirements for Firefighter I training and completion of the course

work. *Id.* The night after the meeting, Burgoyne contacted Nelson, asking: "What were

you mentioning about this in the meeting, firefighting one?" *Id.* When he did not receive

a response, Burgoyne texted Chief Zent, who answered Burgoyne's questions. *Id.* At that

time, Burgoyne was trying to obtain his Firefighter I certification. *Id.*

---

[7] Similar to Zent's testimony given at his deposition, Zent states in his Declaration that, upon
SIRCOMM's transition to a new records management system, he was contacted by Angela Hunzaker
from SIRCOMM, who let Zent know that Burgoyne's text messages were creating interference with
SIRCOMM's ability to manage dispatches. Zent Decl. ¶ 27. (Dkt. 34-6.) Burgoyne objected to this
statement in Zent's Declaration, on the ground that it is inadmissible hearsay. However, this statement
may ultimately be presented in a  form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2), (4).
The objection is overruled.

[8] There were additional text messages sent by Burgoyne between June 3, and July 2, 2019. PSOF
¶ 24. In all, Burgoyne sent 30 messages to SIRCOMM and SIRCOMM sent 15 responses during this time
period. PSOF ¶ 24.

**MEMORANDUM DECISION AND ORDER - 10**

On July 3, 2019, the District terminated Burgoyne's employment based upon two instances of insubordination: (1) choosing to continue to text SIRCOMM despite being told by Chief Zent not to do so because it disrupted operations; and (2) texting firefighter Chris Nelson wiht questions about Firefighter 1 certification, after Zent had instructed Burgoyne to direct all questions and concerns to Zent. (Dkt. 29-19.)

The District had an Employee Policy Manual describing a progressive disciplinary policy. PSOF ¶ 30; DSOF ¶ 30. However, Burgoyne testified during his deposition that he never received any training on the District's disciplinary policies, never received a copy of the Employee Policy Manual, and was not made aware of any disciplinary policies. Burgoyne Dep. 49:12-24. (Dkt. 29-2.) The District does not dispute the language in the policy describing a progressive disciplinary procedure, and that the policy provides for an investigation and review of facts before imposing disciplinary action. DSOF ¶ 31. However, Burgoyne acknowledged that "nobody really follows the policy," and Chief Zent states in his Declaration that the "disciplinary checklist was not used routinely in disciplining paid on call volunteers."  Burgoyne Dep. 49:22-50:3; Zent Decl. ¶ 29.

Burgoyne had never been disciplined by the District prior to the termination of his employment on July 3, 2019. PSOF ¶ 32; DSOF ¶ 32.

## STANDARD OF LAW

### 1.    Summary Judgment Standard

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of

summary judgment "is to isolate and dispose of factually unsupported claims ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). There must be a genuine dispute as to any material fact – a fact "that may affect the outcome of the case." *Id*. at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to a material fact. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the non-moving party's case. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in their favor. *See Devereaux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by…affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. S.F. Unified Sch. Dist*., 237 F.3d 1026, 1029 (9th Cir.

**MEMORANDUM DECISION AND ORDER - 12**

2001). Instead, the "party opposing summary judgment must direct [the court's] attention to specific, triable facts." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## 2.      The Americans With Disabilities Act

In cases alleging disability discrimination under the ADA, the Rehabilitation Act, and the Idaho Human Rights Act, the claims are analyzed the same and, consequently, Burgoyne's claims for disability discrimination under each statutory scheme can be addressed together. *Davenport v. Idaho Dep't of Env. Quality*, 469 F. Supp. 2d 861, 870 (D. Idaho 2006).[9]

"To state a prima facie case under the ADA, [a plaintiff] must show (1) that he is disabled within the meaning of the ADA; (2) that he is a qualified individual with a disability; and (3) that he was discriminated against because of his disability." *Smith v. Clark Cty. Sch. Dist.*, 727 F.3d 950, 955 (9th Cir. 2013); *see also Mayo v. PCC Structurals, Inc.*, 795 F.3d 941, 944 (9th Cir. 2015). "A qualified individual with a disability is defined as 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Smith*, 727 F.3d at 955 (quoting 42 U.S.C. § 12111(8) and *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999)).

---

[9] Burgoyne did not separately argue that he met the elements to establish a prima facie case under either the Rehabilitation Act or the Idaho Human Rights Act. Instead, with the understanding that all three claims require proof of the same elements, he limited his motion for partial summary judgment to his claims asserted under the ADA, noting that the claims are analyzed the same.

The *McDonnell Douglas* burden shifting framework governs claims for unlawful discharge in violation of the ADA's anti-discrimination provisions. *Williams v. G&K Servs., Inc.*, 774 F.App'x 369, 371 (9th Cir. 2019). Therefore, once a plaintiff satisfies the above elements, the burden shifts to Defendant (i.e. to the employer), "to articulate some legitimate, nondiscriminatory reason" for the employment action at issue. *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973).

Plaintiff must establish a causal connection between the termination of his employment or other adverse action and his disability. *Murray v Mayo Clinic*, 934 F.3d 1101, 1105-06 (9th Cir. 2019), *cert denied*, 140 S.Ct. 2720, 206 L. Ed. 2d 855 (2020); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). But-for causation "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360.

## ANALYSIS

Burgoyne argues that he is a "qualified individual" capable of performing the essential functions of a volunteer firefighter with or without reasonable accommodation. He argues that Defendants discriminated against him in violation of the ADA, Section 504 of the Rehabilitation Act, and the Idaho Human Rights Act.

Although Defendants did not move for summary judgment, they attempt to defeat Plaintiff's claims in whole or in part by first arguing Burgoyne has not established that the Association is a covered entity under any discrimination law, and second that Burgoyne did not exhaust his administrative remedies with regard to the District. On the merits, Defendants argue there are genuine issues of material fact regarding whether

Burgoyne is a qualified individual with a disability. Assuming Burgoyne is qualified, Defendants maintain there are disputed issues of material fact regarding his claims of discrimination. Defendants insist Burgoyne's employment was terminated for insubordination, a legitimate, nondiscriminatory reason. Defendants therefore contend that the termination of Burgoyne's employment would have occurred regardless of whether Defendants discriminated on the basis of his alleged disability. Burgoyne argues to the contrary, that "but-for" his disability, his employment would not have been terminated.

Based on the discussion both at the hearing and as set forth below, the Court finds Burgoyne has not carried his burden on this motion to establish a prima facie case of discrimination against the Association. Turning to Burgoyne's claims against the District, the Court first finds that Defendants' exhaustion argument is without merit under the undisputed facts before the Court. And finally, the Court finds a reasonable jury could find either way on the issue of whether Burgoyne was a qualified individual, and subject to unlawful discrimination under the ADA. Burgoyne has not carried his burden to establish the absence of disputed material facts on each of the claims he asserts.

## 1.    Claims Against Rock Creek Firefighters Association, Inc.

Burgoyne asserts in the statement of facts filed with his motion that he worked for the Association and the District. SOF ¶ 1. (Dkt. 32-1.) However, the reference to Burgoyne's testimony in support of that factual statement contains no affirmation that Burgoyne was employed by the Association. Burgoyne Depo. at 35 – 37. (Dkt. 29-2.) Rather, Burgoyne testified during his deposition that he applied to Rock Creek Fire

District and was hired by the District in November of 2017. Greg Vawser, an officer of the Association, states that between 2017 and 2019, the Association did not have any employees and did not receive any federal funds. Decl. of Vawser ¶ 2 – 4. (Dkt. 34-7.) Vawser further states that the Association had no involvement with Burgoyne's hiring, employment conditions, or the termination decision. *Id.* ¶ 5. In reply, Burgoyne points only to the fact that the two entities share the same address, and that the Association "coordinates fundraising and social efforts for the District." Decl. of Rozynski, Ex. 27 at 2. (Dkt. 36-2.)[10]

Burgoyne's evidence is insufficient to establish that the Association receives federal funds, or is a covered entity under the ADA. *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001) (prima facie case under the Rehabilitation Act requires plaintiff to establish the program "receives federal financial assistance"); 42 U.S.C. §12111(5)(A) (defining covered entity under the ADA as a person "engaged in an industry affecting commerce who has 15 or more employees…."). Accordingly, Burgoyne has not carried his burden on summary judgment with regard to the discrimination claims asserted against the Association.[11]

---

[10] Rock Creek Firefighters Association, Inc. is a 501(c)(3) corporation located in Kimberly, Idaho. It shares the same physical address as Rock Creek Rural Fire Protection District. Compl. ¶ 4. (Dkt. 1.) Ans. ¶ 7. (Dkt. 8.)

[11] Defendants did not raise this issue on a motion for summary judgment. However, Fed. R. Civ. P. 56 allows the Court to grant summary judgment for a nonmovant upon proper notice and a reasonable time to respond. Fed. R. Civ. P. 56(f). At the hearing, the Court indicated it expected a stipulation between the parties to be filed prior to trial to dismiss the Association as a named Defendant in this lawsuit.

## 2.     Exhaustion

Burgoyne named the Association, but not the District, as the Respondent in his EEOC charge. He alleged that he started working for Respondent in or about November of 2017 as a volunteer firefighter, and that he believed Respondent discriminated against him on account of his disability. Decl. of Mathews, Ex. A. (Dkt. 34-1.) The Complaint filed with the Court names both the Association and the District as defendants. (Dkt. 1.) The District argues that, because the EEOC charge did not name it specifically, Burgoyne cannot recover on his ADA or IHRA claims asserted against the District.[12]

Generally, only those named in the EEOC charge may be sued because only they had an opportunity to respond to charges during the administrative proceeding. *Sosa v. Hiraoka*, 920 F.2d 1451, 1458 (9th Cir. 1990). Nonetheless, "charges can be brought against persons not named in an E.E.O.C. complaint as long as they were involved in the acts giving rise to the E.E.O.C. claims." *Wrighten v. Metropolitan Hosp.*, 726 F.2d 1346, 1352 (9th Cir. 1984). Further, where the EEOC or defendants themselves "should have anticipated" that the claimant would name those defendants in a suit under the ADA, the court has jurisdiction over those defendants even though they were not named in the EEOC charge. *Chung v. Pomona Valley Cmty. Hosp.*, 667 F.2d 788, 792 (9th Cir. 1982).

The District does not deny that it employed Burgoyne as a volunteer firefighter. Furthermore, Greg Vawser was not only an officer of the Association during the time Burgoyne was employed as a firefighter, but he has also worked as a firefighter for the

---

[12] Defendants raise their exhaustion argument in response to Plaintiff's motion for summary judgment. Plaintiff addressed the argument in his reply memorandum.

District since 1993, and he served as interim fire chief from October 2018 to May 2019. Decl. of Vawser ¶¶ 3, 6 -7. (Dkt. 34-7.) Thus, due to Vawser's dual role at the time Burgoyne was a volunteer firefighter for the District, Vawser's knowledge may reasonably be considered that of the District. Furthermore, Burgoyne countered in his reply brief that the Association, on behalf of the District, responded to the IHRC — Chief Aaron Zent, representing the District along with Assistant Chief Greg Vawser, answered and signed the Employer's response to the charge Burgoyne dually filed with the EEOC and IHRC. (Dkt. 36-2.)

Under these facts, the District should have anticipated that Burgoyne would name it in his suit alleging employment discrimination. The Court finds the District's exhaustion defense fails.

### 3. Qualified Individual

Burgoyne asserts he is a qualified individual capable of performing the essential functions of a firefighter for the District with a reasonable accommodation. While the District does not dispute that Burgoyne was a competent firefighter with a more limited role, the District disputes that Burgoyne was a qualified individual with a disability under the ADA. The District's argument is twofold. First, the District asserts the facts are undisputed that Burgoyne cannot perform essential functions of a firefighter, either with or without an accommodation. Alternatively, the District contends there is a genuine issue of material fact regarding Burgoyne's abilities, which preludes summary judgment in Burgoyne's favor.

Under the ADA, a "qualified individual is an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 989 (9th Cir.2007); *see Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1479–80 (9th Cir. 1996). In determining whether one is a "qualified individual" under the ADA, the Court applies a two-part test. First, the qualified person must possess the requisite skills, experience, education, and other qualifications for the employment position. *See Cripe v. City of San Jose*, 261 F.3d 877, 887 (9th Cir. 2001). Second, the individual must be capable of performing "essential functions." *Id*.

If a disabled person cannot perform the position's "essential functions" even with a reasonable accommodation, the ADA's employment protections do not apply. *Cripe v. City of San Jose*, 261 F.3d 877, 889 (9th Cir. 2001). The law does not require an employer to reallocate or eliminate essential job functions to accommodate an employee with a disability. *McMackins v. Elk Grove Unified Sch. Dist.*, 21 F. Supp. 2d 1201, 1204–05 (E.D. Cal. 1998).

To determine whether a job requirement is an "essential function," the ADA considers "the employer's judgment as to what functions of a job are essential…." 42 U.S.C. § 12111(8); *Cripe*, 261 F.3d at 887 ("Essential functions are fundamental job duties of the employment position…not includ[ing] the marginal functions of the position."). "Essential functions" are not to be confused with "qualification standards," which an employer may establish for a certain position. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007). Whereas "essential functions" are basic "duties,"

29 C.F.R. § 1630.2(n)(1), "qualification standards" are "personal and professional attributes" that may include "physical, medical [and] safety" requirements. *Id*. § 1630.2(q).

A person need not meet each of an employer's established "qualification standards," however, to show that he is "qualified" within the meaning of the ADA. *Bates*, 511 F.3d at 990. Further, "it would make little sense to require an ADA plaintiff to show that he meets a qualification standard that he undisputedly cannot meet because of his disability and that forms the very basis of his discrimination challenge." *Id.* If an employer challenges an ADA plaintiff's claim that he can perform the job's essential functions, the burden of production is on the employer to come forward with evidence of the essential functions of a particular position. *Id.* at 991. (citing *EEOC v. Wal–Mart*, 477 F.3d 561, 568 (8th Cir. 2007)).

Nonetheless, an employer is not required to defend its insistence upon a legally required physical standard. *See Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, (1999). In *Albertson's*, the issue concerned whether an individual with a vision impairment was qualified for a truck driving job. The plaintiff's vision impairment was initially unknown by Albertson's at the time of their hire of the ADA plaintiff. After an on-the job injury sidelined the plaintiff, Albertson's required a physical examination before the plaintiff could return to work. This physical examination revealed that the plaintiff's eyesight did not meet basic Department of Transportation standards, and the plaintiff's employment was terminated.

The United States Supreme Court held that Albertson's was entitled to enforce the visual acuity standard set forth in the DOT's Motor Carrier Safety Regulations, because the regulation defined an "essential job function of the employment position." 527 U.S. at 567. Because the plaintiff could not satisfy the DOT standard, the ADA's protections did not extend to the plaintiff. *Id.* The Court noted that, despite Albertson's hiring decision, and the plaintiff's clean driving record, there was ample evidence in the record that Albertson's required adherence to minimum DOT vision standards for its truckdrivers. *Id.* at n.13. This evidence "would bar any inference that [Albertson's] failure to detect" the plaintiff's vision impairment "raised a genuine factual dispute on this issue." *Id.* at n.13. In other words, the plaintiff's years of driving without incident "did not change the Supreme Court's view that [Albertson's] could insist on strict adherence to the government's safety regulation." *Bey v. City of New York*, 999 F.3d 157, 169 (2d Cir. 2021) (fire department's previous decision to allow firefighters to maintain short beards did not create issue of fact when department later prohibited all facial hair pursuant to binding OSHA regulation that required firefighters to be clean shaven if using SCBA equipment). *See also McNelis v. Pennsylvania Power & Light Co.*, 867 F.3d 411, 415 (3d Cir. 2017) (nuclear power plant employee who was no longer able to satisfy "fit for duty" requirements was not a "qualified individual" under the ADA).

Burgoyne contends that his firefighting certifications[13] from the State of Idaho, NFPA, and the National Wildfire Coordinating Group provide objective evidence he was qualified to perform at least the "basic duties" of a firefighter. He argues that these certifications demonstrate he possessed the requisite skills required of a firefighter. However, the District argues that the nature of Burgoyne's hearing impairment renders him not "qualified" within the meaning of the ADA, despite its concession Burgoyne was a competent firefighter with a more limited role.[14]

The District asserts that one of the essential functions of the job of firefighter includes the ability to communicate verbally while wearing personal protective equipment amid high background noise and low visibility, to work as a team with others, and to be able to fight fires and respond to other calls in varying conditions, including dark and tightly enclosed spaces. *See* National Fire Protection Association Standard (NFPA) 1582 § 5.1, Mathews Decl. Ex. D. (Dkt. 34-3.)[15] *See also Leverett v. City of Indianapolis*, 51 F. Supp. 2d 949, 957, 958-59 (S.D. Ind. 1999) (holding that hearing

---

[13] The District asserts that Burgoyne completed training courses, and was not fully "certified." DSOF ¶ 3. The Court need not resolve this dispute at this time, and will assume, for the purposes of summary judgment, that Burgoyne received "certifications" reflecting completion of the courses he passed.

[14] Chief Zent acknowledged Burgoyne had "developed decent skills as a firefighter….I think Matthew was actually a very good firefighter…he did very well as a firefighter." Zent Dep. 99:7-24. (Dkt. 29-4.) Captain Freeman acknowledged Burgoyne performed competently on the handline during a wildland fire. Freeman Dep. 41:2-17. (Dkt. 29-10.)

[15] The NFPA standard requires that hearing aids or other hearing assistive devices must be worn for members who "have an average hearing loss in the unaided better ear greater than 40 decibels (dB) at 500 Hz, 1000 HZ, 2000 Hz, and 3000 Hz when tested on an audiometric device calibrated per ANSI/ASA S3.6." NFPA 1582 § 9.3.4.2.

**MEMORANDUM DECISION AND ORDER - 22**

impaired firefighter was not a "qualified individual" under the ADA because he could not establish, by a preponderance of the evidence, that he could localize sound while wearing a hearing device.). The District disputes that there was any reasonable accommodation that it could provide to enable Burgoyne to verbally communicate clearly, effectively, and immediately in emergency conditions where there was a risk of harm to himself and others, including the public.

Burgoyne argues that the District's argument is contradictory because the District admits Burgoyne could perform some firefighting activities. For instance, from June 2018 to July 2019, Burgoyne responded to approximately 50 calls, and participated in training exercises. (Dkt. 36-2.) He contends that, if the Court accepts the District's argument, no deaf individuals can be qualified as a firefighter. Further, Burgoyne argues that accommodations, such as non-verbal communication in the form of "tapping," would be appropriate to allow him to fight interior structure fires. Burgoyne Dep. at 25:6-9. The District disputes that it could have accommodated Burgoyne and implemented an alternative to verbal communications to allow him to safely enter structure fires. Zent Decl. ¶¶ 7-8, 14-18. (Dkt. 34-6.) *See also* Bagley Dep. 21:6-24. (Dkt. 29-14.) (denying knowledge of "tapping" system and stating that, "if you can't hear," you are not able to continue in a burning structure).

The Court concludes that the material facts before it are in dispute as to whether Burgoyne is a "qualified individual" within the meaning of the ADA. On the one hand, the District hired him as a volunteer firefighter, knowing he was deaf, and allowed him to perform some firefighting duties. The District drafted an SOP that specifically pertained

to hearing impaired firefighters, and no other firefighter besides Burgoyne was hearing impaired. There is evidence Burgoyne competently performed certain firefighting duties. Nonetheless, NFPA 1582 § 5.1 lists the ability to communicate verbally while wearing PPE and SCBA under certain conditions, the ability to function as an integral component of a team, and the ability to work in conditions with low visibility as "essential job tasks." This is a national standard that appears applicable to all those who wish to become firefighters.[16]

Because there are material fact disputes whether Burgoyne is a qualified individual capable of performing the essential functions of a firefighter, with or without accommodation, Burgoyne's motion for summary judgment will be denied on this issue.[17]

## 4.    Unlawful Discrimination

Burgoyne's specific allegations of discrimination are that the District: (1) imposed a blanket policy excluding deaf individuals; (2) treated him in a disparate manner; (3) failed to provide him with reasonable accommodations; (4) subjected him to a hostile work environment; and (5) retaliated against him in violation of the ADA. Burgoyne alleges that each form of discrimination constitutes an actionable violation of the ADA. The District disputes all of Burgoyne's claims.

---

[16] The Court notes, however, that none of the District's employees testified in their depositions or otherwise stated affirmatively in their Declarations that they consulted, applied, or otherwise utilized NFPA 1582 in the hiring or firing decision. Further, the parties did not provide the Court with any written job description of the "essential functions of a firefighter" in the District's SOP or policies.

[17] Briefing on this issue will be requested prior to trial.

**MEMORANDUM DECISION AND ORDER - 24**

A.    *Blanket Policy*

Burgoyne alleges that the District's blanket policy[18] excluding "all hearing impaired firefighters" from certain tasks, such as participating in interior fire attack at structure fires, entering structures for the purpose of determining the existence or location of a fire, operating in the hot zone at a hazmat incident, or in any atmosphere requiring SCBA, violates the ADA's requirement that disabled persons receive an individual assessment to demonstrate their capabilities. Burgoyne contends that the District did not provide an opportunity for him to demonstrate that, despite his hearing impairment, he is capable of meeting safety standards or other requirements either with or without reasonable accommodations. Burgoyne requests that the Court find the District's policy violates the ADA.

The District counters that the policy is not a "blanket policy," because it was specifically drafted to apply to Burgoyne and constitutes the District's evaluation of Burgoyne's capabilities.

Blanket policies that effectively exclude qualified individuals with disabilities are per se violations of the ADA, because such policies permit employers to avoid performing an individual assessment to determine whether the individual is able to perform the essential functions of his or her job either with or without accommodation. *McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir. 1999) (finding "100% healed" policy is a per se violation of the ADA because the policy does not allow

---

[18] The District adopted Standard Operating Procedure Policy No. 18-034. Rozynski Decl. Ex. 8. (Dkt. 28-8.)

a case-by-case assessment of an individual's ability to perform essential functions of the

job, with or without accommodation.). *See also* 29 C.F.R. § 1630.2(r) ("The

determination that an individual poses a "direct threat" shall be based on an

individualized assessment of the individual's present ability to safely perform the

essential functions of the job. This assessment shall be based on a reasonable medical

judgment that relies on the most current medical knowledge and/or on the best available

objective evidence.").

     One of the essential job tasks of a firefighter is the "ability to communicate (i.e,

give and comprehend verbal orders) while wearing PPE and SCBA under conditions of

high background noise, poor visibility, and drenching from hose lines or fixed protection

systems (e.g., sprinklers). NFPA 1582 § 5.1.1(12). Another essential job task is the ability

to function "as an integral component of a team, where sudden incapacitation of a

member can result in mission failure or in risk of injury or death to members of the public

or other team members." NFPA 1582 § 5.1.1(13). Essential job tasks are to be validated

by the fire department, and the fire department physician is to use the list of essential job

tasks in evaluating the ability of a member with specific medical conditions to perform

specific job tasks. NFPA 1582 § 9.1.1, § 9.1.2.

     The District contends that it evaluated Burgoyne's abilities informally, and

consulted with other fire departments before drafting the policy. Sabin Decl. ¶¶ 2-3. (Dkt.

34-5.) Freeman Decl. ¶¶ 3-5. (Dkt. 34-8.) The District presents evidence that the policy

was necessary to ensure individuals' safety. For instance, Jason Freeman, the District's

captain, states in his declaration that the limitations set forth in the SOP for Hearing

**MEMORANDUM DECISION AND ORDER - 26**

Impaired Firefighters are appropriate to protect the safety of firefighters and civilians, including Burgoyne, and were based upon Burgoyne's known and observed abilities and limitations. Freeman Decl. ¶ 5. (Dkt. 34-8.) Freeman explains that, in his experience, structure fires lack visibility, which would in turn impair Burgoyne's ability to see or touch others, and render him unable to see or hear potential victims or other firefighters. *Id.* ¶¶ 7 – 8. The District contends that, given the nature of Burgoyne's hearing loss, it was able to evaluate his abilities informally over the course of Burgoyne's employment. Freeman Decl. ¶ 18. (Dkt. 34-8); Vawser Decl. ¶ 15. (Dkt. 34-7); Zent Decl. ¶ 5. (Dkt. 34-6) (communicated via lip reading, text messaging, or writing).

There are disputed issues of material fact precluding summary judgment on this issue. Burgoyne appears to conflate a "blanket policy" with the District's policy that applied only to him, because he was the only hearing impaired firefighter employed by the District. There is evidence that the District tailored the policy to Burgoyne's perceived limitations. Further, given Burgoyne was able to respond to approximately 50 calls, and he participated at least once on the handline during a wildland fire, the policy did not prevent Burgoyne from performing some of the duties of firefighter within the context of the District's operations.

The Court finds Burgoyne has not carried his burden of establishing the absence of disputed material facts on this issue.

### B.    *Disparate Treatment*

(1)    *Termination*

Burgoyne alleges the District's reasons for terminating Burgoyne's employment on July 3, 2019 for two counts of insubordination — texting SIRCOMM and texting firefighter Chris Nelson — were pretext for discrimination based upon disability. Burgoyne contends that the improper motive is implied based upon the following facts: (1) the District did not follow its progressive disciplinary policy set forth in its Disciplinary Manual, and instead summarily terminated Burgoyne's employment without a formal investigation or review; (2) Burgoyne texted SIRCOMM as an accommodation he established, and no issues had been brought to his attention before Chief Zent ordered him not to do this; (3) Burgoyne simply asked firefighter Chris Nelson about what transpired during a training meeting; (4) no other firefighters were disciplined for similar conduct; (5) the District had decided to terminate Burgoyne's employment well before July 3, 2019, based upon protected activity; and (6) Burgoyne's employment was terminated based upon his use of a reasonable accommodation.

The District disputes all of Burgoyne's allegations. The District claims that its disciplinary policy had not been revised for eight years, and no one followed the disciplinary policy. Burgoyne acknowledged this fact, as he had never been given a copy of the disciplinary policy nor been instructed about the same. Zent was aware Burgoyne had been texting SIRCOMM, but he claims he ordered Burgoyne to stop texting during SIRCOMM's transition to its new records management system unless it was an emergency. And, the District relies on its July 3, 2019, letter which terminates

**MEMORANDUM DECISION AND ORDER - 28**

Burgoyne's employment because of two instances of insubordination. (Dkt. 29-19.)
Specifically, the July 3, 2019 letter indicates Burgoyne's employment was terminated
because Burgoyne's text messages disrupted SIRCOMM's operations. Chief Zent also
claims that he directed Burgoyne to communicate directly with him and not go to others
with questions, thus the text to Nelson constituted an additional ground of
insubordination. While a jury could certainly find these two reasons insufficient in light
of the April 11, 2009 letter drafted by Chief Greg Vawser, the District points out the prior
letter was never sent and there is no evidence in the record that Chief Zent was aware of
it. A reasonable jury could interpret these facts either way.

Burgoyne has not carried his burden, because he has not demonstrated the absence
of disputed material facts on the issue of whether the District's termination decision was
unlawful under the ADA.

(2)   *Conditions of Employment*

Burgoyne relies also upon numerous instances of alleged disparate treatment that
occurred throughout his employment. Examples he cites include being placed on standby
for calls; failure to consider his requests to work in wildland firefighting; not assigning
him station shift coverage; failing to replace his turnout gear while others received new
turnout gear; being told to wait in the truck during one mutual aid call; and failing to
involve him in weekly training sessions.

The District disputes Burgoyne's characterization of these facts. The District
claims volunteer firefighters were frequently placed on standby. Further, Captain
Freeman indicated Burgoyne assisted on the handline for wildland fires, and that he

assisted Burgoyne with his wildland fire training. Burgoyne did not have EMT or driver certification, which was required before Burgoyne could be assigned to station shift coverage. Budget constraints also limited the District's ability to provide new gear to volunteer firefighters. Nonetheless, the District claims it provided specialized equipment to allow Burgoyne to receive text dispatches, offered interpreter services for the EMT course, and allowed Burgoyne to communicate with SIRCOMM via text up until its software transition. The District also claims Burgoyne did not need an interpreter for staff meetings because volunteer firefighters were not required to attend these meetings, and that Burgoyne was able to communicate effectively with his coworkers via text, speech, and in writing. The District counters that the provision of an interpreter for all situations would have constituted an undue burden on the District given Burgoyne's on-call status.

The Court finds the evidence presented by the District is sufficient to create a triable issue of fact. These material factual disputes preclude summary judgment on Burgoyne's disparate treatment claims.

### C.      *Reasonable Accommodation – Interactive Process*

Once an employee has notified an employer of a need for an accommodation, a duty to engage in an "interactive process" is triggered, through which the employer and employee can come to understand the employee's abilities and limitations, the employer's needs for various functions, and a possible middle ground for accommodating the employee. *Snapp v. United Transportation Union*, 889 F.3d 1088, 1095 (9th Cir. 2018). If an employer receives notice and fails to engage in the interactive process in good faith, the employer will face liability "if a reasonable accommodation would have been

possible." *Barnett v. U.S. Air, Inc*., 228 F.3d 1105, 1116 (9th Cir. 2000) (en banc),

*vacated on other grounds*, *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 406 (2002). In

other words, there exists no stand-alone claim for failing to engage in the interactive

process. Rather, discrimination results from denying an available and reasonable

accommodation. *Snapp*, 889 F.3d at 1095.

Burgoyne makes several claims that the District failed to engage in the interactive

process. He claims the District violated its obligation a number of ways: (1) Zent's order

prohibiting him from communicating with SIRCOMM, without exploring alternatives;

(2) adopting a policy prohibiting all hearing impaired firefighters from performing certain

duties without performing an individualized assessment; (3) denying his requests for an

ASL interpreter for his EMT training and for weekly training meetings; and (4) denying

him an ASL interpreter to discuss his disciplinary actions leading to the termination of his

employment.

The District, however, has introduced facts at this stage to dispute Burgoyne's

claims. They claim that, despite Burgoyne's inability to perform the essential functions of

the job of firefighter due to his profound hearing impairment, they purchased specialized

equipment to allow him to receive radio and text dispatches; they offered interpreter

services for the EMT course, which Burgoyne rejected; and the prohibition on contacting

SIRCOMM applied only during their software transition. The District contends also that

it adopted its SOP for Hearing Impaired Firefighters specifically to address Burgoyne's

abilities and limitations.

**MEMORANDUM DECISION AND ORDER - 31**

The Court finds the evidence presented by the District is sufficient to create a triable issue of fact concerning the District's engagement in the interactive process. These material factual disputes preclude summary judgment on Burgoyne's reasonable accommodation claim.

### E.   *Hostile Work Environment*

The United States Court of Appeals for the Ninth Circuit has not explicitly addressed whether the ADA provides a basis for hostile work environment claims. *Morgan v. Napolitano*, 988 F. Supp. 2d 1162, 1174 (E.D. Cal. 2013). *See Meirhofer v. Smith's Food & Drug Centers Inc*., 415 F. App'x 806, 807 (9th Cir. 2011) (assuming for sake of argument that hostile work environment claims are cognizable under the ADA). Here, both parties have assumed for the purpose of summary judgment that a hostile work environment claim is cognizable under the ADA. Def. Brief at 15 n. 2. (Dkt. 33.)

Borrowing from a hostile workplace claim premised on either race or sex, a plaintiff must show: (1) that he was subjected to verbal or physical conduct related to his disability; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003).

Burgoyne contends he endured a hostile work environment because he was repeatedly subject to abuse, such as being called "retarded" by his colleagues, and that the District knew about this behavior because it was in possession of a psychologist's report documenting the derogatory remarks made by others. He also contends that he

filed an internal complaint with the District concerning discriminatory behavior by another firefighter, and that his co-workers laughed at him during SCBA training, or ignored him during training meetings. Burgoyne also recounts an incident where someone ripped off the nameplate he placed on his locker labeled, "Deaf Firefighter," which made him feel proud. He alleges that no investigation was ever undertaken into these incidents.

The District argues there is no evidence of "severe and pervasive conduct" sufficient to rise to the level of a hostile work environment. Further, the District disputes Burgoyne's account of events. Vawser denies knowing about any derogatory comments made by others to Burgoyne, and he denies that anyone laughed at Burgoyne during SCBA training when he was present. The District also denies that Burgoyne was ignored during training meetings, presenting declarations of those present during these meetings. While the District concedes that the incident regarding the nameplate on Burgoyne's locker occurred, it contends that one isolated instance of offensive conduct is insufficient to create a hostile work environment. The District also alleges it did not understand Burgoyne's February 20, 2019 internal complaint as lodging a complaint based upon discriminatory conduct on account of Burgoyne's disability. And last, the only psychological assessment or report in the record is dated July 10, 2019, which is dated after Burgoyne's termination date of July 3, 2019.

The Court finds the evidence presented by the District is sufficient to create a triable issue of fact concerning Burgoyne's hostile work environment claim. These material factual disputes preclude summary judgment on this claim.

**MEMORANDUM DECISION AND ORDER - 33**

## F.     *Retaliation*

Burgoyne contends there is evidence the District had wanted to terminate Burgoyne's employment as early as April of 2019, citing as a reason Burgoyne's comment about filing a discrimination lawsuit. The draft letter indicated that the termination decision was "the consensus of the commissioners, the shift captains, the EMT department heads and [then interim-Chief Greg Vawser] that [Burgoyne's] position as a paid-on-call firefighter be terminated." Burgoyne argues that this letter is evidence of discriminatory motive, and allows for an inference that the later reason given in support of the termination decision — insubordination — was pretextual.

The District does not deny that Vawser prepared the April 2019 termination letter, but contends that the letter was never sent. Further, Burgoyne remained employed three additional months until July 3, 2019. The District points out that Chief Zent was responsible for terminating Burgoyne's employment and did so on the basis of insubordination. Burgoyne has not presented evidence that Zent was aware of Vawser's earlier letter, and Zent had not begun his employment with the District until May of 2019. Accordingly, the District contends there are factual disputes precluding summary judgment on Burgoyne's retaliation claim.

The Court agrees. A jury could find that the April 2019 letter provides insight into the District's motives for terminating Burgoyne's employment, and that the reasons ultimately given were pretextual. On the other hand, a reasonable jury could find that Chief Zent's reasons were sufficient and not pretextual. This requires an evaluation of the

evidence, and an assessment of the witness' credibility, which the Court cannot do on summary judgment.

## CONCLUSION

Material factual disputes preclude Plaintiff's motion for summary judgment on all issues raised in his briefing. Accordingly, for the reasons set forth herein and consistent with the Court's comments on the record during oral argument, the motion will be denied.

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Plaintiff's Motion for Partial Summary Judgment (Dkt. 29) is **DENIED**.

2)      The Court will set this matter for a jury trial to commence February 6, 2023. A separate order is forthcoming.

DATED: October 14, 2022

Honorable Candy W. Dale
United States Magistrate Judge